IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RONALD H. BURNETT   :   CIVIL ACTION
          :
    v.     :
          :
SCHOOL DISTRICT OF    :
CHELTENHAM TOWNSHIP   :   NO. 04-2680

MEMORANDUM AND ORDER

McLaughlin, J.          July 19, 2006

   The plaintiff teaches chemistry at Cheltenham High School ("CHS"). He alleges that the defendant school district discriminated against him on the basis of race, and otherwise violated his rights, when it imposed intensive supervision upon him, took away his honors chemistry class, and suspended him for ten days. The plaintiff has asserted claims under 42 U.S.C. §§ 1981, 1983, and 1985, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The plaintiff has also asserted claims for breach of contract and intentional infliction of emotional distress under state law.

   The defendant has moved for summary judgment on all counts. The Court will grant summary judgment on the employment discrimination and retaliation claims under § 1981 and Title VII because, even assuming that the plaintiff has stated a prima facie case of discrimination and/or retaliation, he has not shown that the defendant's articulated legitimate, nondiscriminatory

reasons for its actions are pretextual.  The Court will grant summary judgment on the § 1983 claim because the plaintiff has not shown that his due process rights were violated.  The plaintiff has conceded the § 1985 claim.  (2/23/06 Hr'g Tr. at 4-6).[1]  Whereas the federal claims are the bases of the Court's subject matter jurisdiction, the Court will decline to exercise pendent jurisdiction over the plaintiff's state law claims.

I.   Facts

        Viewing the record in the light most favorable to the plaintiff, the Court finds the following facts regarding his employment at CHS from 1999 to 2004.[2]

        A.   1999-2000 School Year

        The plaintiff interviewed for a position at CHS in the summer of 1999.  On July 13, 1999, the Board of School Directors elected him to the position of "Chemistry Teacher."  For the

---

        [1]   The plaintiff has also agreed to dismiss his claims for intentional infliction of emotional distress and for punitive damages.  (2/23/06 Hr'g Tr. at 4-6, 51).

        [2]   On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

1999-2000 school year, the plaintiff was assigned to teach one class of honors chemistry, one class of academic chemistry, and two classes of chemistry in the community. (Eisner Dep. Tr. at 26; Burnett Dep. Tr. I at 63-64 and Ex. B-3 (Teaching Schedules); 7/13/99 Contract).

During the first semester, CHS Principal Joseph Rodgers and CHS Science Department Chair Scott Eisner received several complaints about the plaintiff's grading practices from parents of students in the plaintiff's honors chemistry class. In addition, a female student alleged that the plaintiff had made sexual advances toward her; she later recanted her accusation. (Rodgers Dep. Tr. at 149; Eisner Dep. Tr. at 62-65; Burnett Dep. Tr. II Ex. B-13 (12/22/99 Rodgers Letter to Rajca), Ex. B-14 (12/21/99 Rodgers Letter to Rosenbloom), and Ex. B-15 (12/21/99 Rodgers Letter to O'Briens); Burnett Dep. Tr. I at 34-36).

Principal Rodgers met with the plaintiff on December 14, 1999 to discuss the complaints that had been made against him. Principal Rodgers also expressed concern that the plaintiff was using sexual innuendo in class. (Rodgers Aff. ¶¶ 8-10 and Ex. A (Notes of 12/14/99 Meeting)).

At the end of the first semester, Principal Rodgers noticed that over 50% of the students in the plaintiff's academic chemistry and chemistry in the community classes had received a "D" or lower for the first term, which was not consistent with

-3-

the grades in other sections of those courses. Principal Rodgers convened a formal meeting known as a "PD-2 Conference" on March 1, 2000 to address the plaintiff's mid-term grading and concerns about the plaintiff's classroom judgments in general. At the conclusion of the conference, Principal Rodgers ordered "intensive supervision" for the plaintiff until May 12. Principal Rodgers also told the plaintiff to stop "all-or-nothing" grading and to teach students at an appropriate level. (Rodgers Aff. ¶ 11, Ex. C (2/25/00 Rodgers Letter to Burnett) and Ex. D (3/1/00 PD-2 Conference Report)).

The plaintiff's intensive supervision period ended with another conference on June 15, 2000. Mr. Eisner reported that the plaintiff had been faithful to the supervision plan. That same day, Principal Rodgers gave the plaintiff a perfect rating (80 out of 80) for the 1999-2000 school year. (Rodgers Aff. ¶ 16 and Ex. E (6/15/00 PD-2 Conference Report); Burnett Dep. Tr. I Ex. B-6 (1999-2000 Rating)).

The plaintiff's final grades became available after the June 15 conference. Principal Rodgers discovered that the plaintiff had given 78% of the students in his academic chemistry class a "D" or lower on the final exam, and 51% a "D" or lower for the semester. This grading pattern was much lower than those in other sections of academic chemistry, as well as those in the students' other courses. Principal Rodgers directed the

-4-

plaintiff to reexamine his grading scale for the academic chemistry final exam, and invited the plaintiff to reconsider any and all other grades.  The plaintiff did not change any grades. (Rodgers Aff. ¶ 17, Ex. E (6/15/00 PD-2 Conference Report), and Ex. F (9/15/00 Rodgers Letter to Burnett)).

Over the summer, Principal Rodgers met with four families about the plaintiff's academic chemistry final exam. Principal Rodgers also asked Joe Cifelli, the District's Director of Secondary Education and a former CHS science department chair, to review the exam.  Mr. Cifelli advised Principal Rodgers that the plaintiff's academic chemistry exam did not significantly differ from his honors exam and was too long for the time allotted.  (Rodgers Aff. ¶¶ 19-20 and Ex. F (9/15/00 Rodgers Letter to Burnett)).

Principal Rodgers decided to change the grades in the plaintiff's academic chemistry class himself.  The District's Manual of Policies and Procedures provides that when there is a valid reason to change a grade but the teacher does not do so, "it is the responsibility of administration to examine the circumstances under which the grade was given and to correct or adjust the situation as required."  The Manual of Policies also provides that the principal is the final arbiter of grades. (Id.; Board Policy No. 213).

Principal Rodgers informed the plaintiff of his

-5-

decision to change the grades on September 15, 2000.  Principal
Rodgers also expressed concern about other issues that students
and their families had brought to his attention over the summer,
including lack of feedback on homework and exams, favoritism
towards certain students, and giving nicknames to some students
which they did not like and found demeaning.  Principal Rodgers
took no further action at that time, however.  (Rodgers Aff. Ex.
F (9/15/00 Rodgers Letter to Burnett)).


      B.   <u>2000-2001 School Year</u>

      The plaintiff taught two sections of honors chemistry
in the 2000-2001 school year.  In December 2000 or January 2001,
the plaintiff learned that a student in one of his honors classes
had made allegations of sexual harassment against him.  The
plaintiff approached Principal Rodgers about the allegations, and
Principal Rodgers asked him to participate in a formal meeting.
The plaintiff responded that he would only participate if
Principal Rodgers provided him with a written statement detailing
the allegations beforehand, and if he could have a lawyer
present.  Principal Rodgers initially told the plaintiff that he
could bring a lawyer, but subsequently informed him that he could
only have a union representative.  (Burnett Dep. Tr. I at 117-119
and Ex. B-3 (Teaching Schedules); Rodgers Aff. Exs. H-J (1/25/01,
1/26/01, and 1/31/01 Letters Between Rodgers and Burnett)).

Specifically, the student had alleged that the
plaintiff frequently touched her and other students on the arm,
back, and hair.  The student claimed that the plaintiff stopped
on the two or three occasions she told him to, but started again
later.  The student also alleged that the plaintiff made
inappropriate personal references about himself and students, and
used sexual innuendo, namely references to Austin Powers movies.
The plaintiff denied the allegations.  The plaintiff explained
that he did not have much interaction with this student, and that
if he had touched her, it was only in passing, and was not sexual
in nature.  (Burnett Dep. Tr. I at 127-131 and Ex. B-9 (3/26/01
Report Re: Allegation of Sexual Harassment)).

After an investigation, Principal Rodgers concluded
that the plaintiff was not guilty of sexual harassment.  Mr.
Rogers determined, however, that the plaintiff may have been
guilty of poor judgment in his behavior and comments around
students.  All of the students in the plaintiff's honors
chemistry class rated the class as being less "appropriate" than
their other classes, and reported feeling uncomfortable or
awkward because of the plaintiff's behavior.  Several students
remarked upon the plaintiff's use of sexual innuendo from Austin
Powers movies, references to his personal life, and/or comment
that they would have to rip off a female student's clothes and
throw her into the safety shower if her lab group did not handle

-7-

a chemical properly.  One parent told Principal Rodgers that the plaintiff referred to the girls on his soccer team as "chicks," and to girls' soccer as "chick ball."  (Id.).

In May 2001, Principal Rodgers received a letter from the parent of another honors chemistry student, complaining about the plaintiff's teaching methods and failure to promptly return graded work.  The letter stated that the student was so frustrated with the plaintiff's class that she often came home crying about it.  (Rodgers Aff. Ex. K (5/11/01 M.R.N. Letter to Rodgers); Marcy R.N. Aff.).

Despite his findings about the plaintiff's classroom conduct and the parent complaint, on June 13, 2001, Principal Rodgers gave the plaintiff a perfect rating (80 out of 80) for the 2000-2001 school year.  (Burnett Dep. Tr. I Ex. B-10 (2000-2001 Rating)).

Principal Rodgers received two more letters from parents at the end of the 2000-2001 school year.  The first set of parents complained about the plaintiff's policy on making up missed exams, and alleged that the plaintiff had called his eighth period students his "little expletives."  The second set of parents complained about the plaintiff's grading decisions and failure to promptly return graded work.  (Rodgers Aff. Ex. L (6/12/01 Father and Mother Letter to Rodgers) and Ex. M (7/8/01 R.J.S. Letter to Rodgers); Randall J.S. Aff.).

-8-

C.   <u>2001-2002 School Year</u>

Enrollment in honors chemistry declined in 2001-2002. The plaintiff taught the only section of honors chemistry offered.  (Burnett Dep. Tr. I at 69).

Principal Rodgers received complaints throughout the year from parents of students in the honors chemistry class. Among other things, the complaints alleged that the plaintiff exhibited sarcasm and arrogance when asked to explain material; tested on material he had not fully covered; demeaned, belittled, and physically threatened students; permitted visitors to use obscenities in his classroom; and occasionally put his hands on students "in a totally inappropriate manner."  (Rodgers Aff. Ex N (9/24/01 S.W. and J.S. Letter to Eisner), Ex. O (10/1/01 M.R.C. Letter to Rodgers), Ex. R (2/27/01 M.R.C. Letter to Rodgers), Ex. P (Undated D.S. and J.C.S. Letter to Rodgers), Ex. Q (Undated D.S. Letter to Rodgers), and Ex. T (4/7/02 H.B. and B.B. E-mail to Eisner); Randall J.S. Aff.; Dean S. Aff.).

During the winter of 2001-2002, approximately fifteen of the plaintiff's honors chemistry students requested a meeting with Principal Rodgers.  They expressed concerns that were similar to the parents' complaints.  (Rodgers Aff. ¶ 24(h)).

In March 2002, a student in the plaintiff's chemistry in the community class complained to Principal Rodgers about the plaintiff's grading practices.  In his notes on the meeting,

-9-

Principal Rodgers wrote: "Sense of hopelessness in the class. Everyone expects to do poorly."  (Rodgers Aff. ¶ 24(j) and Ex. S (Notes of 3/2/02 Meeting)).

Mr. Eisner and Principal Rodgers did not share these complaints with the plaintiff as they received them.  On April 22, Principal Rodgers informed the plaintiff that, as a result of the "growing distress" expressed by the plaintiff's honors chemistry students and some of their parents, the plaintiff would have to attend a PD-2 conference on April 24, and receive intensive supervision again.  Principal Rodgers and Mr. Eisner began observing the plaintiff's class on a daily basis on April 22.  (Rodgers Aff. Ex. V (4/22/02 Rodgers Letter to Burnett)).

The plaintiff initially refused to attend the conference unless Principal Rodgers outlined the complaints against him and permitted him to bring a lawyer.  On May 1, Principal Rodgers provided the plaintiff with a list of five areas of concern: 1) students visiting and disrupting his eighth period class; 2) failure to provide feedback on graded work; 3) all-or-nothing grading; 4) excessive use of the overhead projector; and 5) "class climate issues," including reports from students that they felt demeaned or degraded in the plaintiff's class.  Principal Rodgers maintained that it was within the District's discretion to prohibit the plaintiff from having an attorney at the conference.  (Rodgers Aff. Exs. V-Y, AA (4/22/02,

4/23/02, 4/25/02, 5/1/02, and 6/13/02 Letters Between Rodgers and Burnett)).

The PD-2 conference eventually took place on May 7, 2002.  The plaintiff defended his classroom practices and stated that he had been blind-sided because no one had told him about the complaints as they came in.  At the end of the conference, the administrators instituted a plan that included daily supervision of the plaintiff's eighth period honors chemistry class and weekly written feedback for the plaintiff on the five areas of concern.  Although Mr. Eisner and Principal Rodgers had started visiting the plaintiff's class on a daily basis in the last week of April, only the visits that took place after the PD-2 conference were to be considered "formal supervisory material."  (Rodgers Aff. Ex. Z (5/13/02 Report of PD-2 Conference) and Ex. AA (6/13/02 Rodgers Letter to Burnett); 5/22/02 Burnett Letter to Rodgers).

At a follow-up PD-2 Conference, Principal Rodgers acknowledged that the plaintiff had cooperated with the overall process.  Principal Rodgers concluded that visitors to the eighth period class were not distracting, as had been reported, and that there was a "spirit of accommodation" and a "friendly atmosphere" in the class.  Principal Rodgers observed, however, that the plaintiff still returned work without review or commentary, utilized all-or-nothing grading, and had students copy notes from

the overhead for substantial amounts of time.  The plaintiff continued to defend his classroom practices.  (Rodgers Aff. Ex. BB (6/17/02 Report of PD-2 Conference); Burnett Dep. Tr. II Exs. B-19 to B-21 (Feedback Reports)).

On June 17, 2002, Principal Rodgers gave the plaintiff a 70 out of 80 rating for the 2001-2002 school year.  This was a "satisfactory" rating, but the plaintiff disagreed with the deduction of the 10 points.  The plaintiff was not given an opportunity to discuss the rating.  He therefore refused to sign it.  (Burnett Dep. Tr. I at 63-64).

That same day, Principal Rodgers gave the plaintiff his assignments for the 2002-2003 school year.  The assignment included one section of honors chemistry.  The assignment form also stated: "there is a somewhat tentative quality to the specific content of each assignment.  While I believe firmly that the pattern of assignments being distributed today are sound, a few may require adjustment as new teachers are hired or other personnel changes take place."  (Burnett Dep. Tr. II Ex. B-27 (6/17/02 Rodgers Memo to Burnett)).

Sometime during the summer of 2002, Christopher McGinley, then-Substitute Superintendent for the District, decided to reassign the plaintiff away from honors chemistry.[3]

_____

[3]     Mr. McGinley became Superintendent in the summer of 2003.  (McGinley Aff. ¶ 2).

The plaintiff saw a newspaper advertisement seeking an honors chemistry teacher for CHS in July, but was not formally notified of the reassignment until August.  The Collective Bargaining Agreement governing the District and the teachers' union states that the administration should notify a teacher within five working days after it is aware of a need to change the teacher's schedule.  (McGinley Aff. ¶¶ 8-9; Burnett Dep. Tr. II at 64; 1997-2002 Collective Bargaining Agreement).

D.   <u>2002-2003 School Year</u>

The plaintiff did not teach any honors chemistry classes in 2002-2003.  Instead, he taught chemistry in the community, physical science, and a course entitled "Science, Technology & Society."  The plaintiff's intensive supervision period continued for twelve weeks into the fall of 2002. (Burnett Dep. Tr. I Ex. B-3 (Teaching Schedules); Rodgers Aff. Ex. DD (7/9/02 Rodgers Letter to Burnett)).

The plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the EEOC on February 6, 2003, alleging that the District had discriminated against him on the basis of race and national origin in taking away his honors chemistry assignment and in imposing intensive supervision.  The plaintiff served the charge on the District on April 9, 2003.  (2/6/03 PHRC Charge).

The District did not record any complaints and did not take any additional disciplinary actions against the plaintiff in the 2002-2003 school year.  At the end of the year, Principal Rodgers gave the plaintiff an 80 out of 80 rating.  (Burnett Dep. Tr. II at 67).

In May, Mr. Eisner asked all the science teachers to indicate their teaching preferences for the following year.  The plaintiff responded that he only wanted to teach chemistry.  The plaintiff did not receive any chemistry classes, however. (Eisner Statement to PHRC).

That summer, the plaintiff filed another charge with the PHRC and the EEOC, alleging that the District had retaliated against him for filing the first charge by not assigning him any chemistry courses for the 2003-2004 school year and by assigning another teacher to the classroom he had used for the past four years.  The plaintiff served the District with the second charge on September 25, 2003.  (7/16/03 PHRC Charge).


E.   2003-2004 School Year

In 2003-2004, the plaintiff taught only physical science and "Science, Technology & Society."  (Eisner Statement to PHRC).

At some point in the fall, the plaintiff received what he perceived to be a threatening e-mail from the parents of one

-14-

of his students, "N.T."  When N.T. arrived for class, the plaintiff told her to go to the school office.  The staff there did not understand why the plaintiff had sent her to the office, and sent her back to class.  When she returned, the plaintiff sent her back to the office.  (Burnett Dep. Tr. II at 69-79).

In late October or November 2003, N.T.'s parents met with Superintendent McGinley and Assistant Superintendent Dr. Susan Beerman.  The parents alleged that the plaintiff had blown kisses at their daughter, played with her head band, and massaged her shoulders.  The parents also expressed concern about the plaintiff's conduct towards other students.  Dr. Beerman also received complaints from other parents.  Superintendant McGinley asked Dr. Beerman to investigate the parents' allegations. (Beerman Dep. Tr. at 21-24).

Dr. Beerman privately interviewed the four students whose parents had filed complaints, plus seven students that the alleged victims identified as witnesses.  One student stated that the plaintiff had once blown her a kiss, once placed both hands on her shoulders and massaged her, and twice played with a headband on her head.  A second student stated that the plaintiff had blown her a kiss five or six times, and had rubbed her back. Another student complained that the plaintiff had thrown away her prescription glasses after she had forgotten them in class. Other students confirmed these reports.  All the students

reported that the plaintiff insulted students when they asked questions.  (Beerman Dep. Tr. at 35-36; Beerman Aff. ¶¶ 4-5 and Ex. B (Beerman Interview Notes)).

Dr. Beerman shared her findings with the plaintiff on January 12, 2004.  The plaintiff denied all of the charges and challenged Dr. Beerman to go into his class and interview any of his students.  Dr. Beerman subsequently interviewed eight additional students, randomly selected from two of the plaintiff's classes.  These students verified the information Dr. Beerman had received from the alleged victims and witnesses.  Dr. Beerman also discovered another potential victim.  Dr. Beerman then spoke with Uma Jayaraman, the new Science Department Chair. Ms. Jayaraman informed Dr. Beerman that she had witnessed the plaintiff doing things in class that the plaintiff had denied ever doing.  (Beerman Aff. ¶¶ 6-7; Beerman Dep. Tr. at 35-37).

On February 2, Dr. Beerman observed one of the plaintiff's classes.  She heard the plaintiff use the word "hell," even though he had claimed that he never did.  She also observed the plaintiff respond to a student's question abruptly and with an inappropriate look.  She also observed that some of the students were flirting with the plaintiff, but did not include this on her observation form or discuss it with the plaintiff.  (Beerman Aff. ¶ 10 and Ex. D (2/2/04 Formal Observation Form); Beerman Dep. Tr. at 53-61).

Dr. Beerman's final conclusions were that the plaintiff had used inappropriate language in class, gestured to and touched students inappropriately, demonstrated poor judgment in throwing away a student's glasses, interfered with N.T.'s right to an education when he dismissed her from class without justification, and not responded truthfully when interviewed as part of the investigation.  Dr. Beerman shared her conclusions with the plaintiff at a formal meeting on February 5, 2004.  (Beerman Aff. Ex. C. (2/5/04 Investigation Report)).

Based on Dr. Beerman's findings and recommendation, Superintendent McGinley suspended the plaintiff for ten days, nine without pay.  When the plaintiff returned to work, he was placed on intensive supervision again.  (Id.; Burnett Dep. Tr. II at 121).

Sometime after February, the plaintiff supplemented his retaliation charge with an allegation that the defendant had further retaliated against him by suspending him.[4]  The plaintiff filed the instant complaint on June 18, 2004.  As of February 23, 2006, the date of the oral argument on the defendant's motion for summary judgment, the plaintiff was still employed by the District, and had resumed teaching honors chemistry classes. (2/23/06 Hr'g Tr. at 8).

---

[4]   The plaintiff also filed a grievance with his union in connection with the suspension.

-17-

II.   <u>Analysis</u>

       The plaintiff's remaining federal law claims are:
1) employment discrimination, under § 1981; 2) retaliation, under
§ 1981 and/or Title VII; and 3) deprivation of due process, under
§ 1983.   The Court will grant summary judgment in favor of the
defendant on the discrimination and retaliation claims because
the plaintiff has not shown that the defendant's articulated
legitimate, non-discriminatory reasons for its actions – the
history of complaints and concerns about the plaintiff's teaching
methods and behavior – are pretextual.   The Court will also grant
summary judgment in favor of the defendant on the § 1983 claim
because the plaintiff has not shown a deprivation of due process.


       A.   <u>Count I – Race Discrimination</u>

       Count I of the complaint alleges that the defendant
violated § 1981 by discriminating against the plaintiff on the
basis of his race and national origin (Native American).[5]   The
burden-shifting framework set forth in <u>McDonnell Douglas Corp. v.
Green</u>, 411 U.S. 792 (1973) applies to this claim.   <u>Patterson v.
McLean Credit Union</u>, 491 U.S. 164, 186 (1989), <u>superceded on</u>

---

       [5]   To the extent that the plaintiff's claim is based on
his nation of origin, the defendant is entitled to summary
judgment.   Section 1981 prohibits discrimination based on race,
defined broadly as "ancestry or ethnic characteristics," but does
not prohibit discrimination based on a person's nation of origin.
<u>Saint Francis College v. Al-Khazraji</u>, 481 U.S. 604, 613 (1987).

other grounds (McDonnell Douglas framework applies to disparate
treatment claims under § 1981); Jones v. Sch. Dist. of Phila.,
198 F.3d 403, 410 (3d Cir. 1999) (same).[6]

Under the McDonnell Douglas framework, the plaintiff
must first establish a prima facie case of discrimination.  If
the plaintiff can establish a prima facie case, then the burden
shifts to the defendant to articulate a legitimate,
nondiscriminatory reason for the challenged employment action.
If the defendant can do so, then the burden shifts back to the
plaintiff to show that the defendant's articulated reason is
actually a pretext for discrimination.  Id. at 410.

A plaintiff can establish a prima facie case of race
discrimination by showing that: 1) he is a member of a protected
class; 2) he is qualified for the position; and that 3) he
suffered some form of adverse employment action with regard to
that position; 4) under circumstances that give rise to an
inference of unlawful discrimination.  Id. at 410-411.

The defendant challenges the plaintiff's ability to
show that he suffered an adverse employment action.  An adverse
employment action is one that is "serious and tangible enough to

---

[6]     The plaintiff has not put forth any direct evidence of
race discrimination or otherwise set forth a "mixed motive"
theory of discrimination, which would require the Court to
analyze the case under Price Waterhouse v. Hopkins, 490 U.S. 228
(1989) or the standards established by Congress in the Civil
Rights Act of 1991.  See Glanzman v. Metro. Mgmt. Corp., 391 F.3d
506, 512 and n. 3 (3d Cir. 2004).

alter an employee's compensation, terms, conditions, or privileges of employment."   <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004) (internal citation omitted).

The plaintiff alleges that the defendant discriminated against him by subjecting him to unfairly harsh supervision, evaluation, and discipline from 1999 to 2004, and by taking away his honors chemistry class in 2002-2003.

To the extent that the plaintiff's claim is based upon Principal Rodgers' investigation into the sexual harassment allegation in 2000-2001, the plaintiff's "70 out of 80" evaluation for 2001-2002, or the defendant's alleged failure to discipline students who insulted the plaintiff as harshly as those who insulted other teachers, the Court finds that the plaintiff is not able to state a prima facie case of discrimination.  None of these actions altered the terms or conditions of the plaintiff's employment.

To the extent that the plaintiff's claim is based upon the intensive supervision periods in 2000 and 2002, the reassignment from honors chemistry in 2002-2003, and the ten-day suspension in 2004, the Court will assume, without deciding, that these actions constituted adverse employment actions.

Assuming that the plaintiff has established a prima facie case of race discrimination, the defendant has put forth legitimate, nondiscriminatory reasons for each of the challenged

-20-

actions.[7]

Once an employer puts forth some nondiscriminatory explanation for its actions, the burden shifts back to the plaintiff to show that the employer's explanation is a pretext for discrimination.  To defeat summary judgment, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  The plaintiff can accomplish the first by demonstrating that the employer's reasons are "weak, implausible, contradictory, or incoherent."  Or, the plaintiff can accomplish the second by showing that the employer treated similarly situated persons not of the protected class more favorably.  Id. at 765.  See also Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (reaffirming the Fuentes standard, which "places a difficult burden on the plaintiff").

Here, the defendant is entitled to summary judgment because the plaintiff has not pointed to any evidence showing that the defendant's articulated legitimate, nondiscriminatory reasons for (1) imposing intensive supervision in 2000 and 2002,

---

[7]     The defendant's proffered reasons are discussed below.

(2) reassigning the plaintiff from honors chemistry in 2002-2003, or (3) imposing a ten-day suspension in 2004, are pretext for discrimination.

### 1.   2000 and 2002 Intensive Supervision Periods

The defendant claims that Principal Rodgers imposed intensive supervision on the plaintiff in 2000 and 2002 because of complaints and concerns about the plaintiff's grading practices and classroom strategies.  (Def.'s Mot. for Summ. J. Br. at 35).

### a.   Plaintiff's Grading Practices

The plaintiff argues that the concerns about his all-or-nothing grading practices are pretextual, because another teacher who employed similar grading practices was not disciplined, and because the District did not have a set policy about grading.

The record does not support the plaintiff's argument that there was a similarly situated teacher who was treated differently.  At most, the record shows that one other teacher "leaned more toward all-or-nothing" grading, as opposed to "liberal" grading, in that he was "more rigorous in his expectations for the students."  This teacher did in fact award partial credit.  (Eisner Dep. Tr. at 83).  Moreover, there is no

evidence that this teacher gave grades as low as the plaintiff did, or that there were complaints or concerns about his other classroom practices.  Therefore, the plaintiff and this teacher were not "similarly situated."

The fact that the District did not have a set grading policy does not render Principal Rodgers' concerns about the defendant's grading practices pretextual.  The record shows that Principal Rodgers was concerned about the plaintiff's extremely low grades because the District did not have a set grading policy.  In the July 15, 2000 PD-2 Conference Report, Principal Rodgers remarked that "[i]n the absence of fixed local or national standards . . . grading is a matter of credibility and trust . . . .  When one teacher's grades are so substantially different from the norm, there is real impact on the community's trust of all of our professional decisions.").  (Rodgers Aff. Ex. E (6/15/00 PD-2 Conference Report)).

Likewise, the fact that the District did not have a set policy about returning student work, providing feedback, and use of overhead projectors does not render its concerns about the plaintiff's practices in these areas pretextual.  The plaintiff has not pointed to any evidence showing why it would be "weak, implausible, contradictory, or incoherent" for school officials to think that certain practices are not conducive to learning, to want teachers to correct these practices, or to discipline

teachers who do not correct them.  Nor has the plaintiff pointed
to any evidence that similarly situated non-Native American
teachers were treated differently.  The record shows that
although other teachers used overhead projectors, they did not
have students copy notes without comment like the plaintiff did.
(Eisner Dep. Tr. at 138).

b.   Plaintiff's Classroom Climate

The plaintiff also argues that the defendant's concerns
about his classroom climate and behavior are pretextual, because
Principal Rodgers did not observe any problems during the
intensive supervision periods, and because the defendant treated
a non-Native American teacher with classroom control problems
differently.

The fact that Principal Rodgers did not observe any
problems after he began to observe the class does not invalidate
the concerns that led him to impose the intensive supervision.
In Fuentes, the United States Court of Appeals for the Third
Circuit explained that a plaintiff cannot show pretext simply by
arguing that the complaints and criticisms against him were
false; the plaintiff must show that the defendant did not
actually rely on the complaints and criticisms in making its
employment decision.  32 F.3d at 766-767.  Here, the plaintiff
has not pointed to any evidence showing that Principal Rodgers

did not actually rely on the complaints he had received in deciding to impose intensive supervision.

The plaintiff also claims that Principal Rodgers treated him more harshly than he treated a similarly situated non-Native American teacher.  The Court is not certain that this teacher, who was accused of not controlling her classroom, and the plaintiff, who was accused of behaving inappropriately towards students, were "similarly situated."  Even if the Court assumes that they were, the plaintiff has not shown that the defendant treated them differently.

The record shows that the administration received complaints about the other teacher's ability to control her classroom beginning in September 2003.  The administration tried to "help her as much off-the-record as possible," and did not place her on intensive supervision until spring 2004.  The District placed her on intensive supervision again in the fall. (Beerman Dep. Tr. at 77-78, 82-84).

The administration initially tried to help the plaintiff informally as well.  Principal Rodgers first received complaints about the plaintiff in December 1999.  He met with the plaintiff informally on December 14, and did not place the plaintiff on intensive supervision until March 2000.  After that period ended in June 2000, Principal Rodgers did not place the plaintiff on intensive supervision again until spring 2002.

c.   <u>Defendant's Failure to Follow its Policies</u>

Finally, the plaintiff argues that the defendant's articulated reasons for imposing intensive supervision upon him in 2002 are pretextual because the defendant violated its own policies by failing to promptly inform him of the complaints against him.  The plaintiff cites <u>Hillegass v. Borough of Emmaus</u>, Civ. Act. No. 01-5853, 2003 U.S. Dist. LEXIS 10771 (E.D. Pa. June 25, 2003) for the proposition that an employer's failure to abide by its own policies is evidence of pretext.

The plaintiff reads <u>Hillegass</u> too broadly.  At most, <u>Hillegass</u> stands for the principle that a defendant's failure to abide by a policy "<u>which it had abided by in the past</u>" may be evidence of pretext.  <u>Id.</u> at *20 (emphasis added).  In fact, the case upon which <u>Hillegass</u> relies, <u>Poff v. Prudential Ins. Co. of Am.</u>, 911 F.Supp. 856 (E.D. Pa. Jan. 4, 1996), held that a defendant's violation of policy "does <u>not</u>, standing alone, serve to cast doubt on the proffered reason for discharge."  <u>Id.</u> at 861 (emphasis added).  The court in <u>Poff</u> explained that a violation of policy only "assists a plaintiff's case if such violation, in conjunction with other evidence (such as evidence showing that the policy was disparately applied), tends to show that the proffered reason is not credible."  <u>Id.</u>

Here, the District's Manual of Policies and Procedures provides that, "[w]here possible, complaints should be made

directly to the individual involved."  Specifically, "[a] classroom complaint should first be directed to the teacher." When complaints are made to members of the Board or the Superintendent, the complaints "shall be referred to the building principal," who in turn "shall notify the appropriate staff person."  (Board Policy No. 906).  The Manual of Policies does not specify how soon a principal must notify a staff member after a complaint has been made against him.

Even if the Court assumes that the District's stated policy calls for administrators to promptly inform staff members of any complaints against them, the plaintiff has not pointed to any evidence on the record that Principal Rodgers or Mr. Eisner disparately applied that policy.[8]  As the plaintiff acknowledges, the record shows that Principal Rodgers and Mr. Eisner were not even aware that the District had a policy for handling complaints about teachers.  (See Pl.'s Opp. Br. at 9, citing Rodgers Dep. Tr. at 118 and Eisner Dep. Tr. at 94).

---

[8]      The plaintiff has submitted a "Preliminary Case Review and Expert Report" prepared by Edward F. Dragan, Ed.D.  Dr. Dragan's Report refers to affidavits from two of the plaintiff's fellow teachers.  According to Dr. Dragan's Report, the affidavits state that the plaintiff was denied access and information regarding alleged complaints from parents when all non-Native American teachers were routinely given such information.  (Pl.'s Opp. Br. Ex. C (Dragan Report) at 21)).  The plaintiff has not provided the purported affidavits, however. Dr. Dragan's Report is not evidence of the information purportedly contained in the affidavits.

2.   <u>Loss of Honors Chemistry</u>

The defendant asserts that Superintendent McGinley decided to reassign the plaintiff away from honors chemistry in 2002-2003 because the District had received many complaints about him.  (Def.'s Mot. for Summ. J. Br. at 35).

The plaintiff argues that the defendant has wavered in its explanations for the reassignment, thus revealing that the explanations are pretext for discrimination.  According to the plaintiff, the defendant previously explained that it reassigned the plaintiff to better coordinate teachers' schedules.

The plaintiff's argument is not supported by the record.  The defendant's employees have consistently stated that Superintendent McGinley reassigned the plaintiff because of complaints and concerns about his teaching practices in honors chemistry, and that the decision was facilitated by the resignation of another teacher.  (McGinley Aff. ¶¶ 9-10; Rodgers Dep. Tr. at 169 ("Mr. McGinley certainly couched his desire to change Mr. Burnett's assignment in terms of the community concern and community perception of Mr. Burnett's performance.  There was one other issue that wasn't driving it but at least somewhat affected the decision, and that was that we did have a resignation during the summer that affected science staffing.")).

The plaintiff also argues that the defendant's explanation for the reassignment was pretextual, because the

defendant violated the collective bargaining agreement
requirement that teachers be notified within five days of a
change in assignment.  The plaintiff has not put forth any
evidence showing that the defendant disparately applied this
policy, however.


      3.   <u>Ten-Day Suspension in 2004</u>

      Finally, the defendant explains that Superintendent
McGinley suspended the plaintiff in 2004 after Dr. Beerman
concluded that he had engaged in inappropriate conduct.  (Def.'s
Mot. for Summ. J. Br. at 52).  The plaintiff argues that Dr.
Beerman should have been suspicious of the students' allegations
after she witnessed students flirting with the plaintiff, and not
vice-a-versa.

      The plaintiff's argument is inapposite.  "To discredit
the employer's proffered reason . . . the plaintiff cannot simply
show that the employer's decision was wrong or mistaken, since
the factual dispute at issue is whether discriminatory animus
motivated the employer, not whether the employer is wise, shrewd,
prudent, or competent."  <u>Fuentes</u>, 32 F.3d at 765.  Instead, the
plaintiff must show that the defendant did not take the
employment action for the reason that it said it did.

      The plaintiff has not pointed to any evidence showing
that the defendant's stated reasons for suspending him were

implausible or inconsistent.  Nor has the plaintiff provided any evidence that the District did not similarly discipline non-Native American teachers whom it believed to have engaged in such conduct.  Because the plaintiff has not raised a genuine issue of material fact regarding the defendant's articulated legitimate, nondiscriminatory reasons for its actions, the defendant is entitled to summary judgment on Count I.

B.   Count V – Retaliation

Count V of the complaint alleges that the defendant retaliated against the plaintiff for filing charges with the PHRC and EEOC.[9]  The McDonnell Douglas burden-shifting framework also applies to the plaintiff's retaliation claim.  See Shellenberger v. Summit Bancorp, 318 F.3d 183, 187 (3d Cir. 2003); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-501 (3d Cir. 1997).

A plaintiff can make a prima facie case of retaliation by showing that: 1) he engaged in a protected activity; 2) he suffered a materially adverse action (i.e., one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"); and 3) that there was a causal connection between the protected activity and the adverse action.

---

[9]    The plaintiff does not specify whether he is suing for retaliation under § 1981 and/or Title VII.  The elements of a prima facie case are the same under the two statutes.  See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).

See Burlington N. & Santa Fe Ry. v. White, 2006 U.S. LEXIS 4895 at *26-27, 548 U.S. ___ (2006) (internal quotation omitted); Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).

The plaintiff alleges that the defendant did not give him any chemistry classes in 2003-2004 and suspended him in 2004 in retaliation for his filing charges of discrimination.  Even if the Court assumes that these actions would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," and that the plaintiff has established a prima facie case of retaliation, the plaintiff has not refuted the defendant's articulated legitimate, non-discriminatory reasons for its actions.

The defendant proffers that Principal Rodgers and Mr. Eisner decided not to assign the plaintiff to any honors or academic chemistry classes in 2003-2004 because of the plaintiff's history of problems in both of those classes.  They decided not to assign the plaintiff to a chemistry in the community class because enrollment in that course had dropped from three sections to two, and because there was another teacher who had more experience teaching the course, and taught the course as it was designed.  (Def.'s Mot. for Summ. J. Br. at 35).

The plaintiff has not put forth any evidence or argument showing why the defendant's proffered reasons for the 2003-2004 assignment are pretextual.  Nor, as explained above,

-31-

has the plaintiff pointed to any evidence showing that the
defendant's stated reasons for the 2004 sexual harassment
investigation and suspension are implausible or inconsistent.
The defendant is therefore entitled to summary judgment on the
plaintiff's retaliation claim.

     C.    <u>Count II – The § 1983 Claim</u>

     Count II of the complaint alleges that several of the
defendant's employees took certain actions between 1999 and 2004
that violated the plaintiff's right to due process under the
Fifth and Fourteenth Amendments of the Constitution.

     A municipal entity, such as the defendant District, may
not be held liable under § 1983 solely on the basis of respondeat
superior.  <u>See, e.g.</u>, <u>Monell v. Dep't of Social Servs.</u>, 436 U.S.
658, 691 (1978).  A municipal entity may be held liable, however,
for a decision by one of its officers, where that officer
possessed final decision-making authority with respect to the
action that allegedly caused the deprivation of rights.  <u>Pembaur
v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986).  <u>See also
McGreevy v. Stroup</u>, 413 F.3d 359, 367-368 (3d Cir. 2005) (school
district may be held liable for superintendent's employee ratings
decisions, where superintendent had final decision-making
authority over the ratings).

     The plaintiff has not pointed to any evidence on the

record that Mr. Eisner or Principal Rodgers possessed final decision-making authority with respect to their challenged actions.  Thus, the defendant cannot be held liable under § 1983 for their decisions regarding the 2000 and 2002 intensive supervision periods, or the 2001 sexual harassment investigation.

There is a genuine issue of material fact as to whether Superintendent McGinley had final decision-making authority to reassign the plaintiff from honors chemistry in 2002-2003, to order Dr. Beerman to conduct the sexual harassment investigation in 2004, and to suspend the plaintiff for ten days (nine without pay) as a result of that investigation.  (See McGinley Aff. ¶¶ 7-10; Beerman Aff. Ex. C (2/5/04 Investigation Report)).  Even if the Court assumes that Superintendent McGinley did have final decision-making authority, however, the plaintiff has not stated a substantive or procedural due process violation in connection with any of these actions.

The plaintiff cannot state a claim for a substantive due process violation, because tenured public employment is not a fundamental property interest entitled to substantive due process protection.  Nicholas v. Pa. State Univ., 227 F.3d 133, 142 (3d Cir. 2000).

To state a claim for a procedural due process violation, a plaintiff must allege the deprivation of a protected property or liberty interest.  See, e.g., Bd. of Regents of State

-33-

Colleges v. Roth, 408 U.S. 564, 569-570 (1972).

The plaintiff cannot state a procedural due process claim in connection with the reassignment from honors chemistry, because the reassignment did not implicate a protected property or liberty interest.  The plaintiff does not dispute that his salary and benefits remained the same after the reassignment. Where a public employee's salary and benefits remain the same, a change in his work assignment does not deprive him of a protected property interest.  Ferraro v. City of Long Branch, 23 F.3d 803, 806 (3d Cir. 1994) (city employee who was reassigned from managerial to manual work failed to state a claim under § 1983). Furthermore, absent a deprivation of present or future employment, a stigma to a public employee's reputation alone does not implicate a protected liberty interest.  Edwards v. Ca. Univ. of Pa., 156 F.3d 488, 492 (3d Cir. 1998) (tenured professor at a public university who was suspended with pay failed to state a due process claim).

With respect to the 2004 sexual harassment investigation and suspension, the Court will assume, without deciding, that the plaintiff had a protected property interest in not being suspended for nine days without pay.  See Gilbert v. Homar, 520 U.S. 924, 929 (1997) (assuming, without deciding, that police officer had protected property interest in not being suspended indefinitely without pay).

-34-

The question then becomes, what process is constitutionally due.  To answer that question, the Court must balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest."  Id. at 931-932, quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

The plaintiff police officer in Gilbert was suspended without pay for an indefinite period of time after being arrested and charged with possession of, and possession with intent to deliver, marijuana.  The Supreme Court found that as long as the officer received a sufficiently prompt post-suspension hearing, his private interest in the uninterrupted receipt of his paycheck was relatively insubstantial.  The Court found that, on the other hand, the state had a great interest in immediately suspending employees in positions of great public trust and visibility who were charged with felonies.  Finally, the Court held that the state did not have a constitutional obligation to provide the plaintiff with a pre-suspension hearing where the arrest itself provided reasonable grounds to support the suspension.  Id. at 932-933.

Here, the Court finds that the plaintiff's interest in the uninterrupted receipt of his paycheck for nine days was at

-35-

least counterbalanced by the defendant's interest in disciplining a teacher who, upon investigation, had behaved inappropriately, and who did not respond truthfully to the investigation.  The Court further finds that the defendant afforded the plaintiff sufficient pre-suspension process.  Dr. Beerman presented her initial findings to the plaintiff, gave him an opportunity to respond, conducted additional interviews and classroom observation at the plaintiff's request, and presented her findings to the plaintiff again.

Moreover, the plaintiff has conceded that the suspension is the subject of an arbitration hearing through his union.  The plaintiff has not challenged the adequacy of the defendant's post-suspension procedures.

Finally, the plaintiff argues that the suspension violated his liberty interests because it seemed to confirm rumors that he was a "child molester."  To make out a due process claim based on reputational harm, a plaintiff must first show that a state actor published information that was substantially and materially false.  Ersek v. Township of Springfield, 102 F.3d 79, 83-84 (3d Cir. 1996).  In Ersek, the United States Court of Appeals for the Third Circuit held that the plaintiff failed to show a deprivation of his liberty interests because his municipal employer's allegedly stigmatizing statement – that he was the subject of a criminal investigation – was true.  Id. at 85.

In this case, there is no evidence on the record that the defendant made any statements about the plaintiff that were substantially and materially false.  In his deposition, the plaintiff conceded that he was not aware that any administrators or teachers had referred to him as a "child molester."  (Burnett Dep. Tr. II at 104-105).  At most, the plaintiff has alleged that Dr. Beerman disclosed the fact of her investigation to Ms. Jayaraman.  Under <u>Ersek</u>, that disclosure cannot be the basis of a due process claim, because it was not false.

     D.   <u>Count IV – Breach of Contract</u>

Whereas the Court is granting summary judgment in favor of the defendant on the plaintiff's federal employment discrimination, retaliation, and § 1983 claims, the Court will decline to exercise pendant jurisdiction over the plaintiff's state law breach of contract claim.[10]

An appropriate Order follows.

---

[10]   See note 1, above, regarding the plaintiff's Count III – Intentional Infliction of Emotional Distress.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RONALD H. BURNETT        :        CIVIL ACTION
                         :
          v.             :
                         :
SCHOOL DISTRICT OF       :
CHELTENHAM TOWNSHIP       :        NO. 04-2680

<u>ORDER</u>

AND NOW, this 19th day of July, 2006, upon
consideration of the defendant's motion for summary judgment
(Doc. No. 20), the plaintiff's opposition, and the defendant's
reply thereto, and after oral argument on February 23, 2006, it
is HEREBY ORDERED that the defendant's motion is GRANTED for the
reasons stated in a memorandum of today's date.  Judgment is
hereby entered in favor of the defendant, and against the
plaintiff.


This case is closed.




BY THE COURT:


<u>/s/ Mary A. McLaughlin</u>
MARY A. McLAUGHLIN, J.